**STRAWN, et al v. THEODORE STRAWN, Inc., et al.**
No. 5558.
Circuit Court, Lake County.
June 28, 1973.

Paul E. Raymond of Raymond, Wilson, Karl, Conway & Barr, Orlando, for the plaintiffs.

---

Maxwell W. Wells, Jr. of Maguire, Voorhis & Wells, Orlando, and William H. Robbinson, Orlando, for the defendants.

W. TROY HALL, Jr., Circuit Judge.

*Judgment:* This case came on for trial before the court, without a jury, on February 6, 7, 8 and 9 of 1973. There had been several pre-trial hearings and attorneys had furnished the court with memorandum briefs on various points of law which were well done and very helpful to the court and for which the court is certainly appreciative. Final argument was had on June 5, 1973. Between the close of the evidence and final argument, counsel filed trial briefs and reply briefs. The court has now considered the testimony and other evidence adduced at the trial, the briefs of counsel, and final arguments, and now the court makes the findings, conclusions and judgments set forth herein. The court deems it appropriate to make a preliminary statement of the case before stating findings, conclusions and judgments.

### Parties

The plaintiffs in this cause are Theodore R. Strawn, a citizen of Volusia County, and Seminole Woods, Inc., a Florida corporation in which Theodore R. Strawn is the principal and controlling stockholder.

Defendants are Theodore Strawn, Inc., a Florida corporation (in which Theodore R. Strawn was formerly a principal stockholder), Robert R. Strawn, brother of Theodore Strawn, Marian W. Strawn, wife of Robert Strawn, and the children of Robert and Marian Strawn, together with the spouses of two of them to-wit: John R. Strawn and Anita J. Strawn, his wife, Kirk Strawn and Charles S. Strawn, his wife, and David U. Strawn, a single person.

## Statement of the case

This suit arises out of a transaction closed on August 31 of 1967 which was designed and intended to divide assets of two Strawn family corporations and certain other assets among three Strawn brothers — plaintiff, Theodore R. Strawn; defendant, Robert R. Strawn; and Chester C. Strawn, not a party to this suit. In the transaction, the main asset received by plaintiff Theodore Strawn was a tract of land in Lake County, known as the Theresa Rodriquez Grant, owned by Theodore Strawn, Inc. prior to the transaction in question. The Grant was conveyed to plaintiff Seminole Woods, Inc., a corporation formed to receive this portion of Theodore Strawn's share of the division.

After the closing of the transaction on August 31, 1967, the plaintiffs discovered that Theodore Strawn, Inc. and the defendant, Robert R. Strawn had engaged in several transactions with reference to the mineral rights to the Theresa Rodriquez Grant. The first transaction was a deed dated February 15, 1955 from Theodore Strawn, Inc. conveying undivided interests in certain surface mineral rights to members of the Strawn family including Robert R. Strawn, his wife, Marian Strawn, and his three children, John R. Strawn, David U. Strawn, and Kirk Strawn. The second transaction was a deed dated July 30, 1965, whereby Wilson Cypress Company conveyed to Robert R. Strawn, his son, John R. Strawn, and his wife, Marian Strawn, as joint tenants with right of survivorship, the petroleum, gas and subsurface mineral rights in the Theresa Rodriquez Grant. When these transactions were discovered, plaintiffs demanded that all of the mineral rights held in the name of Robert R. Strawn or members of his family be released or conveyed to Theodore Strawn's corporation, Seminole Woods, Inc. Chester Strawn and members of his family promptly conveyed surface mineral rights in their name over to Seminole Woods, Inc. Compliance with this demand by Robert Strawn and members of his family has consistently been refused and hence this lawsuit.

In this suit plaintiffs advance a six count complaint seeking relief on a number of cumulative and alternative grounds which will now be summarized.

14

Plaintiffs contend that the conveyance of surface mineral rights in the deed of 1955 is invalid and ineffective because the corporation never authorized an unconditionally effective conveyance of these rights. The plaintiffs contend that the evidence shows either that the officers who signed the deed and the person who caused it to be recorded acted without proper corporate authority or that, if authorized so to act, nevertheless their authority was to make only a conditional execution and delivery of the deed. The condition was that a contract for sale of surface mineral rights would be consummated with W. R. Grace and Company. This contingency never occurred, and the conveyance by the corporation to the family members therefore never became truly effective between the parties. Theodore Strawn, Inc. continued to be the true owner of the surface mineral rights, they contend, and these rights passed by the deed of August 31, 1967, to Seminole Woods, Inc. The outstanding 1955 conveyance of the surface mineral rights is therefore a cloud on the title of the plaintiff, Seminole Woods, Inc., to its surface mineral rights and the cloud should be quieted by cancellation of the deed. This contention is covered by Count VI of the complaint.

In the alternative if it is held that the record does not prove the ineffectiveness of the 1955 conveyance, then plaintiffs contend the contract executed on August 1, 1967 must be interpreted so that it requires Theodore Strawn, Inc. to convey all surface rights ever owned by it including such rights as it gratuitously titled in the family names by the 1955 deed. This interpretation would place the obligation on Theodore Strawn, Inc. to recover the surface rights in order to perform its contractual undertaking. This is Count I of the complaint. As an alternative contention plaintiffs urge that if the words in the contract have not been proved to have the foregoing meaning, then the offending phrase "owned by the corporation" should be deleted by reformation. So reformed, the plaintiffs believe the contract should then be interpreted so that it requires the corporation to recover any outstanding rights and convey them over to the plaintiff, Seminole Woods, Inc. and to the extent this duty is not performed, the corporation should answer in compensatory damages. Reformation is sought in Count II as to the contract and in Count III as to the deed.

Also plaintiffs contend that by this execution of the contract, Robert Strawn obligated himself personally to perform the same to the extent his performance is necessary to conclude the contract. Therefore, as to those surface rights owned by Robert Strawn, he should be ordered to convey by judgment of specific performance. As to the corporation, plaintiffs urge that a judgment be entered ordering the corporation to recover the surface rights and convey

them and providing for damages to be assessed if the same is not done in a reasonable time. Counts I and II seek specific performance against Robert Strawn and Theodore Strawn, Inc.

As to the 1965 acquisition of subsurface oil and petroleum rights by Robert Strawn and members of his immediate family, plaintiffs contend that they have proved that in doing so, Robert Strawn wrongfully availed himself of a business opportunity belonging to the corporation, Theodore Strawn, Inc., and that he did not present the opportunity to the corporation before taking it for himself, his wife, and his son. Therefore, Robert Strawn's action made him, as well as Marian Strawn and John Strawn, who gave no consideration, constructive trustees holding legal title to the subsurface rights for the use of the corporation. When the deed to Seminole Woods, Inc. was executed and delivered 'this deed carried the corporation's equitable title with it, because the equity is an unexcepted part of the grantor's interest in the Theresa Rodriquez Grant. Plaintiffs say they are now entitled to have the trust executed by judgment ordering Robert Strawn, Marian Strawn, and John Strawn to convey the oil and gas rights to the plaintiff, Seminole Woods, Inc. Plaintiffs further contend that the equities in the cause do not require them to reimburse Robert Strawn for his purchase monies for the reason that plaintiffs have previously given full consideration to Theodore Strawn, Inc., for the entire interest of Theodore Strawn, Inc. in the Grant and Theodore Strawn, Inc. is the proper party, if anyone, to reimburse Robert R. Strawn and the members of his family for any of their expenditures on account of the oil and gas rights they hold as trustees. Nevertheless, plaintiffs have tendered reimbursement if the court finds it essential to do equity. These contentions are set forth in Count V.

The issues to be decided in this cause were set in the court's pretrial order entered on the 31st day of January, 1973. And the issues set forth in said order are adopted and incorporated herein by reference.

*Findings of fact and conclusions of law*

Theodore Strawn died in 1925 survived by his wife, Candace R. Strawn, and four sons, Robert R. Strawn, Chester C. Strawn, Theodore R. Strawn, and Gordon Strawn. At the time of his death, Theodore Strawn was one of the largest individual growers of citrus in the state of Florida. All of his estate was devised to his wife. In 1931 Theodore Strawn, Inc., a Florida corporation, was formed by Candace R. Strawn and she conveyed to the corporation all of the assets which had comprised the estate of her deceased husband. From that time until August 31 of 1967, the Strawn family owned the stock of Theodore Strawn, Inc. This corporation,

together with another corporation subsequently formed and named Strawn Groves, Inc., operated a citrus business in Florida and a farming business in Illinois and engaged in some saw mill, timber logging, and cattle operations. The stock of the corporations was owned by the Strawn brothers, their mother, and to a limited extent, by the children of the Strawn brothers.

Gordon Strawn's interest in the family corporations was bought out some time prior to 1950. Thereafter he no longer participated in the family's business affairs.

Candace Strawn died on May 26, 1961. Her will bequeaths the residue of her estate to Theodore Strawn, Inc.

From the time of Theodore Strawn's death, the family worked together in managing their properties. Robert Strawn, Chester Strawn and Theodore Strawn and their mother during her lifetime were the directors of each family corporation. Each was also an officer. Robert Strawn held the title and position of general manager. After his mother's death, Robert Strawn was president of Theodore Strawn, Inc.

For many years and particularly after the death of Candace Strawn, the brothers found it difficult to get along with each other. Chester Strawn and Theodore Strawn desired to separate the family's assets so that each could go his own way. Following many months of negotiations, a series of agreements designed to accomplish this division were entered into on August 1, 1967.

### Purchase of Theresa Rodriquez Grant

The tract of land known as the Theresa Rodriquez Grant is a rectangular parcel located in Lake County, containing approximately 5,900 acres measuring roughly four miles long by two miles wide. The tract was acquired by Theodore Strawn, Inc. by deed dated July 27, 1950, recorded on July 28, 1950 in deed book 301 at page 177, public records of Lake County. This deed is plaintiffs' exhibit 43.

The Theresa Rodriquez Grant was acquired from Wilson Cypress Company. Initially, Wilson Cypress Company was not willing to include any mineral rights in a sale of the tract. The Strawn family was unwilling to purchase the land on these terms, and so Chester Strawn was delegated to negotiate for an agreement which would include the mineral rights. As a result of Chester Strawn's efforts, an agreement with Wilson Cypress Company for inclusion of surface mineral rights in the sale was reached, but he was unable to bring them to agree to convey the oil and gas rights.

An additional consideration of $4,000 was paid by Theodore Strawn, Inc. for the surface mineral rights.

### 1955 mineral rights deed

Sometime prior to 1954 the directors of Theodore Strawn, Inc. received information from the United States government that aerial photographic surveys using infrared photography indicated the possibility of deposits of phosphate and similar minerals on the Theresa Rodriquez Grant. Late in 1954 W. R. Grace and Company, a large and substantial mining company, approached Theodore Strawn, Inc. with a written offer to enter into an agreement for exploration and the possible mining of surface minerals on the Rodriquez Grant. Royalty revenues anticipated to be received by the Strawn corporation under this proposed mining venture were substantial. If successful, it was estimated the family could realize as much as $1,000,000 from the mining venture.

In connection with the negotiations with W. R. Grace and Company, and after this company had made its offer to purchase the rights, the shareholders of Theodore Strawn, Inc. were advised by their tax advisor, an accountant, that corporate income taxes could be avoided if the mineral rights were transferred from Theodore Strawn, Inc. to the individual shareholders before an agreement as to the exploration or mining was completed with W. R. Grace and Company. The family members and corporate directors agreed upon a plan wherein the rights were to be transferred to the names of the family. A plan for dividing the mineral rights among the family was formulated and the royalty percentages were arranged so that not only the shareholders but also the wives and children would be included among the owners of the mineral rights. Sidney H. Taylor, an attorney practicing in DeLand, and representing the family in negotiations with W. R. Grace and Company prepared proposed minutes of a meeting of the corporate board of directors at which a plan to divide the mineral rights among the family would have been adopted together with a proposed deed for this purpose. (Defendants' exhibit 2). The minutes and deed were transmitted to the family by letter dated February 9, 1955. The proposed minutes were never completed, signed, and placed in the corporate records. The corporate minute book does not contain minutes or any other evidence of authority for the corporate officers to convey surface mineral rights to the family.

The deed of mineral rights dated February 15, 1955 was prepared by Sidney H. Taylor and signed by Candace Strawn and Chester C. Strawn as president and secretary respectively of Theodore Strawn, Inc. The same was recorded in the Lake

County public records on February 17, 1955. The corporate financial and banking records reveal that on February 25 and 27, 1955, the corporation received $1,309 from Robert Strawn, Chester Strawn and Theodore Strawn each, and $833 from Candace Strawn, which payments were recorded as "payment for mineral rights." The corporate records also indicate that a special meeting of the directors was held on February 17, 1955 at which bonuses of $2,000 each to Robert Strawn, Chester Strawn and Theodore Strawn and $900 to Candace Strawn, Chester Strawn and Theodore Strawn and $900 to Candace Strawn were granted. The intention of the board in declaring these bonuses was to "wash out" the payments being made for surface mineral rights as set forth above.

The entire transaction represented by the deed dated February 15, 1955, was tax-motivated and entered into solely for the purpose of avoiding taxes it was believed would result from a sale to W. R. Grace and Company. Theodore Strawn believed that the family's decision to convey surface rights was tied to the final closing of a sale to the W. R. Grace Company. He believed the transfer out of the corporation was to be consumated only if the W. R. Grace Company transaction was consummated. It is not clear whether Theodore Strawn believed the deed never should have been recorded or that he believed that, if the deed was recorded, nevertheless the transfer was not to have effect except as stated. There is ample support for Theodore Strawn's belief, and it is not unreasonable for him to have held such a belief. As a consequence of this belief by Theodore Strawn, he thought Theodore Strawn, Inc. owned all of the surface mineral rights pertaining to the Grant at all times during the matters discussed herein.

### Split-up negotiations

During 1967 the Strawn brothers resolved to divide the assets and businesses formerly owned by the two family corporations among themselves. On August 1, 1967, four agreements were executed by the brothers to effect the division. One agreement provided for a complete redemption of stock in Strawn Groves, Inc. owned by Theodore Strawn and by his daughter, Patricia Strawn Doyle. A second agreement provided for a complete redemption of stock in Theodore Strawn, Inc. owned by Chester Strawn. A third agreement provided for creation of a subsidiary of Strawn Groves, Inc. and transfer to it of certain assets going to Chester Strawn in the division followed by an exchange of all of the stock in Strawn Groves, Inc. owned by Chester Strawn and his daughters, Sylvia Crump and Marilyn Tankersley, for the stock of the new subsidiary.

Finally, a fourth agreement provided for a split-up of Theodore Strawn, Inc. through creation of a wholly owned subsidiary and transfer to the subsidiary of certain property and businesses consisting of the Theresa Rodriquez Grant followed by surrender of the stock in Theodore Strawn, Inc. owned by Theodore Strawn in return for all of the stock of the subsidiary. The subsidiary created by this fourth agreement is Seminole Woods, Inc., a plaintiff herein, and it is this fourth agreement which is involved in this suit. The circumstances immediately leading up to the division set forth in the agreements of August 1, 1967 are as follows. For many years Chester Strawn and Theodore Strawn had been unhappy with the arrangement whereby the family assets and businesses were owned in common ownership through the medium of the corporations. They desired to arrange for a division in kind of the assets among the brothers so that each could pursue a course of management and estate planning independently. Robert Strawn opposed such a division preferring to keep the properties and businesses in corporate solution. On several occasions after the death of Candace Strawn, Chester Strawn and Theodore Strawn attempted to bring Robert Strawn to an agreement for a division in kind of the assets and businesses.

In November of 1965, Theodore Strawn consulted Paul E. Raymond, an attorney practicing in Daytona Beach, regarding his desire for a division. As a result of this conference, Chester Strawn and Theodore Strawn ultimately entered into an agreement dated July 11, 1966 wherein it was agreed that the two would cooperate to effect a division in kind of corporate assets; a plan for division upon which Chester Strawn and Theodore Strawn would agree was specified; and it was agreed that if an acceptable division could not be reached by agreement, Chester Strawn and Theodore Strawn would vote their stock in favor of dissolution and liquidation of Theodore Strawn, Inc. and Strawn Groves, Inc. This agreement is plaintiffs' Exhibit 45.

Pursuant to the agreement, a letter dated July 25, 1966, was written to Robert Strawn by attorney Raymond. (Plaintiffs' exhibit 1). Thereafter, a conference was held in August of 1966 which was attended by Chester Strawn, his attorney, George W. Johnson of Orlando, Maxwell W. Wells, Jr., attorney for Robert Strawn, and attorney Raymond and Theodore Strawn. As a result of the conference, it was agreed that Chester Strawn and Theodore Strawn would submit a specific proposal for a division of assets among the brothers to attorney Wells and that Robert Strawn would respond to such proposal.

A proposed division of assets was set forth in a letter dated September 1, 1966 from George W. Johnson and Paul E. Raymond

to Maxwell W. Wells, Jr. (Plaintiffs' exhibit 2). This letter was prepared by attorney Johnson, but language describing the property to be received by Theodore Strawn was copied from a memorandum prepared by attorney Raymond. An error in this transcription was later noted and corrected in a letter from attorney Raymond to attorney Wells dated September 12, 1966. (Plaintiffs' exhibit 4.)

Commencing with the letter of September 1, 1966, negotiations extended over a period of several months during which there were several conferences among the attorneys and the brothers, telephone conferences, and considerable correspondence was exchanged. The correspondence involved in these negotiations down through January 16, 1967, is plaintiffs' exhibits 1 through 5.

With the letter dated November 16, 1966 from attorney Wells to attorneys Raymond and Johnson and the responses of attorney Raymond on December 8, 1966 and attorney Johnson on December 9, 1966 (all in plaintiffs' exhibit 5) the correspondence indicates that points of disagreement were limited to the question of interest to be paid Theodore Strawn on cash coming to him and to the question of who should receive the current crops on the Illinois farms going to Chester Strawn. Atorney Wells indicated that he considered the letters to constitute an "agreement."

Beginning in March of 1967, Joel H. Sharp, an attorney practicing in Orlando as a member of the same firm as George W. Johnson, began drafting a formal contract to embody the terms of the agreement. Numerous drafts were prepared by attorney Sharp and submitted to the brothers and their attorneys. Seven drafts of a single agreement embodying the entire transaction among the three brothers and the two corporations were prepared by attorney Sharp and submitted. These seven drafts, together with correspondence pertaining to each, are plaintiffs' exhibits 6 through 26 in chronological sequence.

Upon the advice of a firm of attorneys in Washington, D.C., associated by attorneys Raymond and Sharp for guidance in tax matters, the division was broken down into a series of four agreements providing separately for the transactions of Chester Strawn and Theodore Strawn with Theodore Strawn, Inc. and Strawn Groves, Inc. (T. 75). On July 25, 1967 attorney Sharp submitted the first drafts of agreements drawn in this fashion to attorneys Wells and Raymond. The transmittal letter is plaintiffs' exhibit 27 and the two "sample" drafts therein contained are plaintiffs' exhibits 28 and 29. Subsequently on July 28, 1967, a complete package of four agreements was submitted by attorney Sharp to

attorneys Wells and Raymond. The transmittal letters are plaintiffs' exhibit 30 and 31 and the drafts submitted at that time are plaintiffs' exhibits 32, 33, 34 and 35. These drafts were the penultimate drafts of each agreement. A meeting at which each brother would execute the contract was scheduled for July 31, 1967 in attorney Wells' office, but the meeting was rescheduled and all parties executed the agreements in a conference held on August 1, 1967 in the offices of Maxwell W. Wells, Jr. Many of the changes in the July 27, 1967 drafts were made on advice of Washington tax counsel; but some changes were made at the direction of attorney Wells. The final versions of the agreements were not seen by attorney Raymond or Theodore Strawn until the afternoon of August 1, 1967, as they entered the conference at which the signing took place.

In the agreement of July 11, 1966 between Chester Strawn and Theodore Strawn, in all of the letters exchanged by the attorneys in which assets are described, and in each of the drafts of the formal contracts except the final draft which was signed, the following phrase is included in the description of the Lake County property to be received by Theodore Strawn —

> "together with all surface mineral rights heretofore conveyed or released by Wilson Cypress Company."

One of the changes made in the draft of July 27, 1967 was to insert the words —

> "owned by the corporation"

into the last quoted phrase immediately after the word "rights," so that *in the final draft only,* the phrase reads —

> "together with all surface mineral rights owned by the corporation heretofore conveyed or released by Wilson Cypress Company."

Insertion of the words "owned by the corporation" was made at the instance of attorney Wells during a conference with attorney Sharp on the morning of August 1, 1967. Attorney Raymond was not present at this conference. Attorney Wells did not direct the attention of attorney Raymond or Theodore Strawn to the change — indeed the change was not brought to the attention of attorney Raymond or Theodore Strawn by anyone. The closing of the contracts was held in attorney Wells' office on August 31, 1967. At that time, the deed from Theodore Strawn, Inc. to Seminole Woods, Inc. conveying the Rodriquez tract was executed and delivered. The deed (plaintiffs' exhibit 44) contains the same language with respect to surface mineral rights as appeared in the executed contract. The deed does not except subsurface or oil and gas rights.

Throughout this transaction, Robert Strawn knew that Theodore Strawn was mistaken with respect to the surface rights. Robert Strawn knew that Theodore Strawn believed he would receive the rights. Probably Robert Strawn knew that Theodore Strawn believed he would receive the rights because Robert Strawn also recognized that the 1955 deed was not supposed to have been effective. But no matter how or why he knew, nevertheless it is clear that Robert Strawn knew. Knowing of his brother's mistake, Robert Strawn, his advisors and family members followed a careful plan of fostering and encouraging Theodore Strawn's mistake. No one on Robert Strawn's side ever mentioned the rights to anyone on Theodore Strawn's side. Even though the documents existed and Robert Strawn had possession of them and a contractual duty to produce them, not one piece of paper which could or might have reminded Theodore Strawn of the 1955 recorded deed ever surfaced during the transaction. When Theodore Strawn's counsel mentioned that the abstracts should be brought up to date and examined, he was told by Robert Strawn that there was no need to examine the title; no changes had occurred since the Grant was acquired. When Theodore Strawn's attorney asked Robert Strawn's attorney if changes had taken place in the title subsequent to a date in 1954 at which the abstracts, when finally produced, were found to terminate, Theodore Strawn's attorney received an evasive answer calculated to sidestep a direct answer which necessarily would have revealed the 1955 deed. Although Robert Strawn felt the language of the contract extended to all of the rights in the family and he insisted upon a last minute change calculated by him to alter that meaning, the change was masked by a screen of similar (but meaningless) changes in other documents and presented by Robert Strawn's attorney to Chester Strawn's attorney as a technical change in language not having substantial effect upon the meaning of the documents. No one ever pointed out to Theodore Strawn or his attorney that any change whatever had been made.

Not only was Robert Strawn aware of the true facts regarding the 1955 deed and aware that his brother Theodore Strawn was dealing blind on the subject, but also Robert Strawn manifested, on numerous occasions, an apparent acquiesence in language which he believed would obligate him and the corporation to convey the full complement of rights and not simply those rights titled in the corporation on the record. Robert Strawn testified that it was his belief that the language "together with all surface mineral rights heretofore conveyed or released by Wilson Cypress Company" would extend to the rights owned by the family. On many occasions Robert Strawn's attorney, with Robert Strawn's

authority, represented that Robert Strawn was agreeable to this language. Furthermore, Robert Strawn himself signed an agreement for division which included the words which Robert Strawn testified he believed obligated the corporation to convey the full complement of surface rights.

The contract, in its language pertaining to surface rights, is ambiguous when read in light of all of the surrounding circumstances in that on its face the contract could be understood to refer to one of two classes of mineral rights, viz —

> 1. All of the surface rights pertaining to the Theresa Rodriquez Grant, including rights gratuitously conveyed to family members in the aborted 1955 transaction.

> 2. Only a portion of the surface mineral rights being the portion never conveyed out of the corporation plus those reconveyed from the estate of Candace R. Strawn.

The bare language can be understood to refer to either class of rights because the time of ownership by the corporation is not designated or specified and therefore is ambiguous in that it could be construed to mean — (1) owned by the corporation at any time, (2) owned by the corporation heretofore, (3) owned by the corporation at the time of negotiations, (4) owned by the corporation at the time of making the contract, (5) owned by the corporation at the time of closing on the contract. Basically, the question is whether the language refers to all of the rights the corporation heretofore owned, i.e., the first group of rights, or whether it refers to rights owned at the time the contract was signed, i.e., the second class of rights.

Defendants think that, on its face, the language unambiguously refers to the second class of rights, the lesser category, and that any other construction would be unnatural. To the contrary, however, when the question as to which class of surface rights this language encompasses is posed to the language, and all of the circumstances surrounding the transaction are considered including the purpose sought to be accomplished by the agreement, it is apparent that the phrase must be fastened to a point in time by reference to matters in parol.

The only reference to time appearing in the phrase is the adverb "heretofore," and it is syntactically correct that an adverb be placed either before or after the modified word. It is as reasonable to conclude that "heretofore" modifies "owned" as that it modifies "conveyed" so that the phrase is intended to be structured as follows —

> "together with all surface mineral rights owned
> by the corporation heretofore . . ."

The syntax of the phrase is suited as well with this interpretation as with the competing interpretation.

Furthermore, while defendants think the literal and natural meaning of the phrase is limited to the second and smaller category of surface rights, it is clear that the contrary is true for defendants argue for an interpretation which has the effect of simply deleting the phrase from the contract. Thus it is seen that the legal sense of the sentence dictates that the adverb "heretofore" should modify owned, so that the phrase refers to rights owned before the contract and not owned at the time of the contract; otherwise, the phrase actually has no meaning whatsoever. If the entire phrase were deleted from the property description, plaintiff, Seminole Woods, Inc. would be entitled to receive exactly the same rights that defendants claim the phrase, with all of its words, entitles Seminole Woods, Inc. to receive. This is true because a conveyance of the fee described by surface metes and bounds carries with it all of the transferor's mineral rights unless they are particularly excepted from the transfer. If there is any meaning or function to be given to the language in question, then it must be that the words are there in the contract to indicate that the contract refers to more than the rights which would be included if the words had not been placed in the contract. The law and common sense prefer an interpretation which gives meaning to the words to an interpretation which renders words nugatory. Logically and actually, the phrase must refer to rights "owned . . . heretofore . . ." That reference is to the larger category of surface rights.

When the grammatical and legal sense of the words indicate defendants' interpretation is doubtful, reference to the circumstances surrounding the transaction cast an even heavier burden of doubt on the defendants' reading of the words. The record is clear that the general purpose of the transaction was to divide among family members a family fortune amassed over almost two generations.

The motivating desire of the majority in numbers and interest of the brothers was to forge an independence from their dominant sibling. Chester Strawn and Theodore Strawn wanted their own share of the family estate in separate and independent solution. So strongly did they desire independence that they were willing to concede to their brother Robert Strawn a share larger than his third in order to achieve their independence by mutual consent.

This central function of the contract has significance rooted in the beginning of the corporation itself. It was formed after the

death of its namesake by his widow and its initial assets consisted of his estate. Over the years of her lifetime, Candace R. Strawn used the corporation as the vehicle for holding the entire family wealth together and as the bond holding her sons together as well. Indeed, her will bequeaths her residuary estate to the corporation. Following their mother's death and a lifetime of forced association, the brothers wanted to be free and independent of each other. The transaction into which they entered was one in which a family fortune, built up over almost two generations, was being divided among the family members with a chief objective to achieve separate and independent ownership.

Insofar as Theodore Strawn is concerned, the interpretation urged by defendants frustrates and subverts the central purpose of the transaction. He has testified that he cannot deal with his land as a marketable asset because part of the mineral rights stand in the name of Robert Strawn and his family. Robert Strawn's interpretation of the contract so that he retains, in effect, a veto over Theodore Strawn's disposition of the Grant may please Robert Strawn very well but it flies in the face of the central object sought to be accomplished by the contract.

Defendants have argued that the transaction was a corporate transaction dealing with "corporate assets" and should not be interpreted to refer to assets not owned by the corporation. But Robert Strawn admitted that the transaction did not deal exclusively with corporate assets. Judge David Strawn conceded that nothing in the body of the contract limited assets passing to Theodore Strawn's corporation to those owned by the corporation.

Even though the transaction accurately can be described as a division of corporate assets, the central purpose of the transaction and the overriding operative intention of the parties was to effect a clean-cut parting of the ways — a full and complete division of corporate owned assets. In making this division, it was clearly part of their intention that where the parties had let corporate related assets fall into individual family ownership these were also included in the transaction. The "Judge Peacock Easement" brought out in Robert Strawn's testimony is a pertinent example of this.

Part of the assets going to Chester Strawn included groves in the western part of Volusia County. An easement which had been acquired many years previously from a Judge Peacock pertained to one or more of Chester Strawn's groves. The easement, inexplicably, was vested in Robert Strawn's individual name. It was included in the transaction and conveyed to Chester Strawn's control along with the groves to which it pertained. Here it is

clearly and obviously revealed that, although the transaction was a division of corporate assets, nevertheless individual assets were included to the extent necessary to accomplish the primary goal of the parties, being a clear-cut division of the assets.

No amount of general language describing the transaction as a corporate transaction is sufficient to overcome the hard and particular evidence that the particular surface mineral rights involved, regardless of their ownership among the family or corporation, were the object of the contract. The intention of the contract is that Theodore Strawn is to become the free and clear outright owner of the Theresa Rodriquez Grant. The Grant is a corporate asset. If some individual members of the family are owners of part interests in this corporate asset it is the clear intention of the contract that a complete package of ownership as to the Grant will be delivered over to Theodore Strawn and this extends to recovery of the outstanding partial interest. Such an intention does not change the fact that statements describing this transaction as a division of corporate assets are true. The primary operation intention, however, referred to the physical assets — orange groves, the Theresa Rodriquez Grant, etc. These were to pass into the separate control of the brother involved. Any outstanding individual ownership of the rights pertaining to these hard assets in the family were to be swept along with the assets to which they pertained.

Robert Strawn's testimony regarding his personal reservation of rights as to the Theresa Rodriquez Grant clearly shows that the parties contracted with respect to the physical assets and not to their metaphysical ownership —

> "I was granted [the reservations] because that was the Theresa Rodriquez Grant and they contained certain items, whatever you want to call them."

Theodore Strawn's testimony demonstrates the very same thinking when he states that 'the agreement pertained to "corporate assets and *what the corporate assets included*."

It is to be observed that the family setting in which the contract falls is quite significant for it reveals that an intention by the corporation to obligate itself to recover and convey surface rights covered by the 1955 deed would not have been unusual. The overall purpose of the contract being to separate the three brothers in their ownership of family properties, it would be consistent that any rights pertaining to the family's corporate owned properties which had been vested in the individual members of the family would have been intended to be included in the transaction. The family

members who own the surface mineral rights acquired them in a transaction which was cavalier in its disregard of the separateness of the interests of the corporation and the family members. Rights so acquired certainly can be expected to be returned in the same fashion. While the surface rights in question may technically be owned by the family members, they are not in the same category as the independent wealth of these family members. The rights were gratuitously procured from the corporation in an aborted transaction and for a purpose which failed. The rights were ripped off the corporation's fee ownership of the Grant, leaving it in a vulnerable position. They are rights which ought to be owned by the corporation. The individual owners certainly have no equitable claim as owners of the rights and surely ought to be expected to put the rights back where they found them.

Even on the foregoing facts and without reference to the intention of the parties, it is clear that the correct meaning of the contract is that the larger category of rights should be conveyed to Theodore Strawn's corporation. Beyond their own idea of the literal meaning of the words, defendants have no interpretive indicia to favor their side. But, if defendants are correct that a literal meaning of the language could favor their reading, then the language is ambiguous and the ambiguity is to be resolved by further inquiry into extrinsic evidence of intention.

In this inquiry, it is the intention of Theodore Strawn, Inc. the corporation which must be discerned, and that intention is a function of the resolve of the three-man board of directors consisting of Chester Strawn, Theodore Strawn and Robert Strawn. Although a great deal was said at the trial and in defendants' first brief about Robert Strawn's private, personal intention as to whether all surface mineral rights were to be included, this is impertinent. The question is not to determine Robert Strawn's personal and private intention as to the scope of the corporation's undertakings; rather the question is to determine the intention of the corporation itself. Robert Strawn was but one of three directors, and he was a minority in this case. In this connection it is useful to notice that the agreement itself, in the form signed by Robert Strawn, includes statements to the effect that a majority of these brothers have determined to have a division thereby recognizing the bifurcation of opinion which existed on the board.

The evidence that the corporate intention is to convey all surface rights even to the inclusion of rights held by family members is overwhelming. The record is clear that Theodore Strawn harbored such an intention. Chester Strawn's intention is also clear. Chester Strawn's expressed intention was that all of the surface rights were

to be conveyed to Theodore Strawn, and when they were found to be outstanding Chester Strawn and his family conveyed to Seminole Woods, Inc. with no further consideration from Theodore or Seminole Woods, Inc.

The genesis of this transaction was an agreement between Chester Strawn and Theodore Strawn in which each bound himself to the other to vote to cause the corporation to make the conveyances set forth therein. (Plaintiffs' exhibit 45). The words "owned by the corporation" do not appear in that agreement, and no evidence was produced which would indicate that Chester Strawn did not intend at all times to abide by his agreement with Theodore Strawn. The wording of this agreement is hard evidence as to the corporation's intention, for the transaction which came to pass was the very performance of the agreement between Chester Strawn and Theodore Strawn.

Finally, of course, it has been proved that the words "owned by the corporation" were inserted in the contract on the morning of the day it was signed, a fact which is quite significant considering that this contract was negotiated over a span of more than a year and was rewritten at least seven times. The record is heavy with prior drafts of agreements and letters in which the phrase appeared —

> "together with all surface mineral rights heretofore conveyed or released by Wilson Cypress Company."

Indeed, Robert Strawn himself executed a draft in these words (plaintiffs' exhibit 18), and as much as eight months prior to the change Robert Strawn's attorney was insisting in his correspondence that an "agreement" had already been reached, referring to a version of the phrase not including "owned by the corporation". The questionable words were placed in the contract at the eleventh hour in a conference at which Theodore Strawn was not present or represented and the change was never pointed out to Theodore Strawn or his attorney. When Maxwell W. Wells, Jr. proposed the change to Chester Strawn's attorney, Joel Sharp, he did not explain to him that the change had any potential significant effect on the meaning of the contract. Indeed, both Maxwell Wells and David Strawn testified that they did not believe the phrase "owned by the corporation" made any change in the meaning of the phrase into which it was inserted.

Under these circumstances it is clear that the contract's meaning should be determined in light of what the words "owned by the corporation" meant to Chester Strawn and Theodore Strawn when

it came to the signing on the afternoon of August 1, 1967. To these men, the phrase necessarily meant that the surface rights acquired from Wilson Cypress in 1950 and "owned by the corporation" then were to be conveyed to Theodore Strawn's corporation even to the extent of the portion of the rights conveyed to the family in 1955 because it is quite clear that the operative intention was that Theodore Strawn was to receive all of the rights to the Grant which the corporation had acquired from Wilson Cypress Company.

Furthermore, Robert Strawn's own intention, for legal purposes, was exactly the same as that of Chester Strawn, Theodore Strawn and Theodore Strawn, Inc., for he manifested an intention to be bound to deliver all surface mineral rights ever owned by the corporation just as much as the corporation manifested such an intention. In executing the contract, he was obligating himself personally with respect to the corporate undertaking. Moreover, he is estopped to claim he had a different intention. Although he testified that he harbored his own personal reservations secretly and did not want the mineral rights included, he also testified that he never mentioned this matter openly to Theodore Strawn or Theodore Strawn's attorney or Chester Strawn or Chester Strawn's attorney. There was an implicit understanding among the participants on their side that it was not to be mentioned by Maxwell Wells. (T. 423-424). Maxwell Wells testified that he never brought to light the subject of the outstanding mineral rights, although he was well aware of them. Under these circumstances where Robert Strawn had repeatedly indicated his assent to words which he admits he believed would bind him to deliver all of the mineral rights, and in light of the circumstances under which Robert Strawn procured the insertion of the words "owned by the corporation" in the contract, it is necessarily true that Robert Strawn's legal intention should be that all surface mineral rights ever owned by the corporation are includible.

The personal endorsement of Robert Strawn on this contract must be held to include a personal obligation of Robert Strawn to deliver his own share of the minerals. He is bound to perform the contract by delivering anything in his possession or ownership required to be delivered to perform the terms of the contract. Although the premises of the contract state that the parties are Theodore R. Strawn and Theodore Strawn, Inc., nevertheless the first recital in the contract is that Robert Strawn and Chester Strawn "join in execution of this agreement to give their consent and approval and agree to be bound hereby." Paragraph 2 of the agreement states "all of the assets described in exhibits A and B shall be transferred to the Theodore Strawn corporation in exchange for stock thereof,"

and at the end of the agreement the following appears — "the undersigned consent to and approve this agreement and agree to be bound thereby." There follows the signature of Robert R. Strawn in the presence of George W. Johnson and Paul E. Raymond as witnesses. (Plaintiffs' exhibit 37). Robert Strawn's testimony on the effect of his personal execution of the contract is coy and evasive. At one point he clearly testified that he recognized a personal duty to produce abstracts, papers and documents relating to the properties, (T. 407-408) and claims he performed it. At another point, when queried as to whether he committed himself personally to convey surface rights he was evasive claiming not to be qualified to answer. (T. 388). Execution of the contract individually and the agreement to be bound thereby must be held to include the agreement to do any act or deliver any thing necessary to be done on the part of the individual in order to carry out the contract. If Robert Strawn has in his possession or in his name assets described on exhibit A of the August 1, 1967 contract and if Robert Strawn is bound by the contract, then when the contract states that the assets described in exhibit A shall be transferred to Theodore Strawn's corporation, then necessarily Robert Strawn should be required to perform pro tanto his ability to perform.

The correct interpretation of the contract accordingly will be determined to be that Theodore Strawn, Inc. is obligated to convey to Seminole Woods, Inc. all surface mineral rights which the corporation acquired from Wilson Cypress Company including those which were gratuitously titled in the family's name in the aborted W. R. Grace and Company transaction. Robert R. Strawn is personally obligated to convey the rights standing in his own name. As to the rights in individual names, the corporation has failed to perform its contract, and, likewise, Robert R. Strawn has failed to perform his contract. Robert Strawn will be ordered to convey those rights in his name. As to the corporation, it does not presently appear to own any rights and so ordinarily a judgment of specific performance would not be considered grantable inasmuch as a court of equity would deem it impracticable to supervise a purchase and subsequent sale. However, this case is unique inasmuch as the controlling party of Theodore Strawn, Inc. and the hold-out owners are related as father and son or husband and wife, the contract itself contemplates recovery of the rights, and plaintiffs have not asked the court to use its powers in personam to enforce a decree of specific performance but rather its power to grant damages. Furthermore, the court will not assume that the corporate defendant will not in good faith attempt to perform the requirements of a decree or that Robert Strawn's family will not in good faith cooperate with their father's corporation once they are made to

know what its legal obligations are. Accordingly, the court will grant the prayer for specific performance in a short time, and will retain jurisdiction for the purpose of ruling on the count for partition, and other relief when it is known whether the same will be required.

Plaintiffs urged their counts for reformation as in the alternative to the count for construction, and while it is true that the remedy could be alternative, it is not antagonistic. Upon the same facts which show the foregoing interpretation as the correct interpretation even with the offensive words in the text, it can also be concluded that the words should not be left in the contract. The phrase "owned by the corporation" was placed in the contract by mistake and must be deleted.

## Purchase of oil and gas rights by Robert R. Strawn

As was noted earlier, Theodore Strawn, Inc. was unable to induce Wilson Cypress Company to sell oil and gas rights underlying the Grant at the time it was acquired in 1950. Nevertheless, the corporate officers and the family members desired to acquire the rights. During the negotiations, sincere efforts were made to induce Wilson Cypress Company to include subsurface mineral rights in the transaction. But these efforts were not successful.

Robert R. Strawn, at all times material to this count, believed that the subsurface mineral rights bore a significant and valuable relationship to the corporation's ownership of the Grant and to the businesses making use of the Grant in which the corporation was engaged. Robert Strawn believed these rights were more valuable in the hands of the corporation than in the hands of outsiders, which could have been hostile hands.

In 1961 Robert Strawn made an inquiry to an official of Wilson Cypress Company as to whether the subsurface rights could be purchased at that time. As a result of Robert Strawn's inquiry Wilson Cypress Company addressed a letter dated June 10, 1961 to Theodore Strawn, Inc. to the attention of Robert Strawn (plaintiffs' exhibit 50). In this letter the rights were offered to the corporation for a price of $7.50 per acre. The contents of the letter were brought to the attention of Chester Strawn and Theodore Strawn by Robert Strawn, and the matter was discussed among them in a conference at which all were present shortly after the letter was received. As a result of the meeting, a majority of the board determined not to accept the offer of $7.50 per acre at that time. It was determined that efforts to acquire the subsurface

mineral rights at a lesser figure should be continued by Robert Strawn in behalf of the corporation.

On July 15, 1961, and after the meeting of the three brothers discussed above, Chester Strawn and Theodore Strawn signed a letter (plaintiffs' exhibit 47) in which it is stated — "Due to the departure of Chester Strawn on a vacation, this letter will serve to express his views pertaining to his (and my) vote on this limited mineral rights offer to Wilson Cypress Company." The letter states that neither of its signatories will agree for the corporation to pay a price in excess of $1 per acre. This letter was drafted by Theodore Strawn at the request of Chester Strawn because Chester Strawn was leaving the state for his annual visit to Illinois during the summer months and he did not want Robert Strawn and Theodore Strawn to take action regarding the subsurface mineral rights during his absence and without consultation with him. Neither Chester Strawn nor Robert Strawn considered the letter to bind them except during Chester Strawn's absence from the state during the summer of 1961. Robert Strawn never knew the letter existed at any time material to the matters in this count.

In 1963 Robert R. Strawn continued to negotiate with Wilson Cypress Company for the purchase of the oil and gas rights. Correspondence regarding this negotiation is contained in plaintiffs' exhibit 50. As a result of Robert Strawn's negotiations, Wilson Cypress Company finally offered to sell the rights for $3 per acre with terms permitting the purchase price to be paid over a three-year period. Robert Strawn admits that he did not communicate to Chester Strawn or Theodore Strawn the opportunity to purchase subsurface rights for $3 per acre, and this admission is found to be a fact.

In a letter of September 9, 1963 to Wilson Cypress Company (exhibit 50) Robert Strawn agreed to pay a price of $3 per acre for the rights over a three-year period, and he stated — "I have decided to ask you to make title rather than just to myself — as follows — Robert R. Strawn, Marian W. Strawn, John R. Strawn, as joint tenants with right of survivorship." Thereafter, on October 26, 1963, Robert R. Strawn, his wife, Marian W. Strawn, and his son, John R. Strawn, signed a contract with Wilson Cypress Company (plaintiffs' exhibit 41) for purchase of oil and gas rights to the Rodriquez Grant at a price of $3 per acre with an agreed acreage of 5,090.14, making a total purchase price of $15,270.42 payable — $4,428.42 upon execution of the agreement, and three annual installments of $3,314 together with interest at the rate of 6% per annum on the unpaid balance until paid in full. This con-

tract was recorded in Lake County public records in official records book 249 at page 249.

All payments on the contract to Wilson Cypress Company were made by Robert R. Strawn with checks drawn on his personal checking account at Florida Bank at DeLand, as follows — check dated October 26, 1963, in the amount of $4,428.22; check dated September 14, 1964, in the amount of $4,197.64; check dated March 31, 1965, in the amount of $3,803.13; and check dated July 8, 1965, in the amount of $3,677.24. Neither Marian W. Strawn nor John R. Strawn contributed purchase money to the contract payments from funds of their own.

After payment in full, Wilson Cypress Company conveyed the oil and gas rights to Robert Strawn, his wife and son by the deed dated July 30, 1965 and recorded in official records book 292 at page 902, public records of Lake County. (Plaintiffs' exhibit 40.)

After the meeting in 1961 at which the letter dated June 20, 1961 (plaintiffs 'exhibit 50A) was discussed by Robert Strawn, Chester Strawn and Theodore Strawn, Robert Strawn claims in testimony contradicted by his deposition that he sought to induce the corporation to offer $2.50 per acre. Theodore Strawn denies this. Robert Strawn admits that he did not offer to Theodore Strawn, Inc. the opportunity to purchase said rights at the price of $3 per acre.

The court finds that Robert Strawn did not report to Theodore Strawn on any aspect of his negotiations subsequent to the 1961 meeting where Robert Strawn was delegated to negotiate for acquisition by the corporation of the oil and gas rights by the members of the board of directors. Robert Strawn was under a duty expressly conferred upon him by the board of directors in his capacity as president and general manager to attempt to acquire the oil and gas rights at the best possible price for the corporation. Nevertheless, Robert Strawn did not report to Theodore Strawn as to any part of his 1963 negotiations with Wilson Cypress Company.

At all times pertinent to this count, John R. Strawn was an employee of Theodore Strawn, Inc., occupied in a managerial position. He owned a duty of loyalty and faithfulness to the corporation that employed him. John R. Strawn knew of his own personal knowledge of all of the facts which the court finds to be true in this count. He knew that his father was delegated by the corporation to negotiate to acquire the oil and gas rights, and he knew that his father was not reporting to the full board of directors regarding the 1963 negotiations and purchase of oil and gas rights.

John R. Strawn gave no consideration to Wilson Cypress Company nor to his father for the conveyance of the undivided interest in the oil and gas rights which was made to him. As to John R. Strawn, the conveyance of the oil and gas mineral rights was a gift from his father.

Marian Strawn gave no consideration to Wilson Cypress Company nor to her husband for the conveyance of oil and gas mineral rights to her. As to Marian Strawn, the conveyance of an undivided interest in the oil and gas mineral rights underlying the Theresa Rodriquez Grant was a gift. Marian Strawn is chargeable with knowledge of all of the facts found by this court to be true with respect to the oil and gas mineral rights purchase regarding her husband's duty to negotiate and acquire the oil and gas rights for the corporation and his failure to do so.

The opportunity to acquire the oil and gas mineral rights underlying the Grant was a business opportunity in which Theodore Strawn, Inc. had an actual and abiding interest. Ownership of the outstanding oil and gas mineral rights was an essential part of the corporation's ownership and use of the Grant. The corporation's interest in the rights was significant and valid. Furthermore, if the rights came into hostile hands the corporation could be seriously harmed in its efforts to enjoy the use and benefit of its property. The members of the board of directors considered that ownership of these rights was significant and valuable to the corporation, and the board of directors could and would have caused the corporation to avail itself of the opportunity to purchase these rights if Robert Strawn had communicated the opportunity to the board. The corporation never declined or refused to avail itself of the opportunity which Robert Strawn converted to himself and his family. Wilson Cypress Company never refused to deal with the corporation in this matter. In fact, Wilson Cypress Company initially offered to deal with Theodore Strawn, Inc.

After he acquired the subsurface mineral rights, Robert Strawn never reported to the corporation that he had done so. During the split-up negotiations, Robert Strawn never disclosed his interest in the subsurface rights.

The deed of August 31, 1967 was intended by the grantor-corporation to convey to the grantee all of the right, title, and interest of the grantor-corporation in and to the Grant including legal and equitable rights pertaining to said lands. No exception or reservation as to any subsurface or oil and gas mineral rights is made in the deed, nor is any such exception intended by the deed. The August 31, 1967 deed conveyed all rights of Theodore Strawn, Inc.

pertaining to the oil and gas rights to Seminole Woods, Inc., including the right which Theodore Strawn, Inc. then had to enforce a constructive trust against Robert R. Strawn, John R. Strawn, and Marian Strawn causing them to be held trustees of the oil and gas mineral rights for the benefit of the corporation and requiring them to convey to the corporation.

The terms of the contract of August 1, 1967 obligate Theodore Strawn, Inc. to make the conveyance above described to Seminole Woods, Inc. upon the agreed consideration of Theodore R. Strawn's surrender of all his stock in Theodore Strawn, Inc. Consideration has therefore previously been given to the corporate defendant for its equitable rights in the Grant. No further consideration from Theodore R. Strawn, or Seminole Woods, Inc., for the conveyance from Robert R. Strawn, John R. Strawn and Marian W. Strawn is due. The court finds that the corporate defendant previously has been fully compensated for this conveyance. If there is an equitable right to reimbursement for purchase monies paid by Robert Strawn, then it is a right which lies against Theodore Strawn, Inc., but the court is not called upon to determine the relative rights of Robert R. Strawn and Theodore Strawn, Inc. The court further notes that Robert R. Strawn is the controlling party of Theodore Strawn, Inc., and he is capable of causing said corporation to reimburse him if he chooses to do so.

With respect to the oil and gas rights, the court concludes that Theodore Strawn, Inc., had a valid and significant interest in acquiring the rights pertaining to the Grant. Robert R. Strawn was under a duty to acquire these oil and gas rights for the corporation. John R. Strawn was under a duty to acquire the oil and gas rights for the corporation. Marian Strawn is chargeable with notice that her husband and son were under said duties. When Robert R. Strawn acquired the oil and gas rights for his own interest and had the same conveyed to Robert R. Strawn, Marian Strawn and John R. Strawn, he violated his duty to the corporation. John R. Strawn's participation in this transaction violated his own duty to the corporation. The duty owed by Robert R. Strawn and by John R. Strawn to Theodore Strawn, Inc. is fiduciary in character.

Because the said rights were purchased in violation of a fiduciary duty owed to the corporation by Robert R. Strawn and John R. Strawn of which Marian Strawn had or was chargeable with notice, and because neither Marian nor John R. Strawn gave any consideration, the three of them shall not be entitled to retain the benefits of the ownership of the oil and gas rights. They hold title subject to a constructive trust. Initially, Theodore Strawn, Inc. was the

36

cestui que trustent of said constructive trust, but the right of Theodore Strawn, Inc. to enforce said constructive trust was conveyed in the deed of August 31, 1967 unto Seminole Woods, Inc., and, therefore, Seminole Woods, Inc. is now the beneficial and equitable owner of all of said oil and gas rights, and Robert R. Strawn, Marian Strawn, and John R. Strawn hold legal title as trustees for Seminole Woods, Inc., which corporation is now entitled to judgment enforcing and executing said equitable trust by ordering the said trustees to convey to Seminole Woods, Inc. forthwith, and providing that if the conveyance is not made, then the judgment shall stand and operate as a conveyance.

The said trustees are not entitled to be reimbursed by the plaintiff Seminole Woods, Inc. for their purchase money because Theodore R. Strawn previously gave consideration to Theodore Strawn, Inc. for its conveyance to Seminole Woods, Inc. of the equitable title to the oil and gas rights. If the trustees, or Robert R. Strawn alone, are entitled to reimbursement then said reimbursement would be due from Theodore Strawn, Inc., but that issue has not been presented to the court and hence is not decided.

Wherefore, it is ordered and adjudged as follows —

The true and correct meaning and intent of the agreement dated August 1, 1967 as it pertains to surface mineral rights to the property known as the Theresa Rodriquez Grant in Lake County, Florida, is that Theodore Strawn, Inc. undertakes and promises therein to convey unto Seminole Woods, Inc. (identified in said agreement of August 1, 1967, as the "Theodore Corporation") all of the surface mineral rights which the said Theodore Strawn, Inc. previously had acquired from Wilson Cypress Company, and this undertaking and promise extends *pro tanto* to any rights described in the deed dated February 15, 1955 which may remain outstanding.

The proper interpretation or construction of the agreement of August 1, 1967 as it pertains to the personal undertakings and obligations of the defendant, Robert R. Strawn, evidenced by his endorsement and execution of said contract under the legend which states "the undersigned consent to and approve this Agreement and agree to be bound thereby," is that the defendant, Robert R. Strawn, personally undertook to do and perform any and all acts necessarily required to be done on his part in order to effectuate the complete performance and execution of the contract. This undertaking on the part of Robert R. Strawn extends to the delivery by good and sufficient deed of title to any of the assets standing or titled in his name and required by the contract to be conveyed to

plaintiff, Seminole Woods, Inc., including that certain undivided 16.66% of the surface mineral rights standing in the name of Robert R. Strawn pursuant to the deed of February 15, 1955.

To this date, the defendants, Theodore Strawn, Inc. and Robert R. Strawn have not fully and completely performed their undertakings, promises, and duties under the said contract of August 1, 1967, in that title to surface mineral rights remains outstanding to the extent of an undivided 27.78% interest standing in the percentages indicated — Robert R. Strawn 16.66%; John R. Strawn 2.78%; David Strawn 2.78%; Kirk Strawn 2.78%; Marian Strawn 2.78%. These undivided interests have not been conveyed to Seminole Woods, Inc. although plaintiff Theodore R. Strawn and plaintiff Seminole Woods, Inc. have done and performed timely and completely all of the things required to be performed on their part by the said agreement and Seminole Woods, Inc. is entitled to receive the aforesaid outstanding rights from Theodore Strawn, Inc.

Seminole Woods, Inc. do have and recover from Theodore Strawn, Inc. and from Robert R. Strawn all of the mineral and other rights pertaining to the lands described in and conveyed by the deed dated August 31, 1967, and recorded in official records book 343 at page 865, public records of Lake County, Florida, and which have not heretofore been conveyed to plaintiff Seminole Woods, Inc., expressly including the undivided 27.78 percent interest or portion of all of the minerals of every kind, nature and description including all phosphates, limerock, dolomitic limestone, kaolin, clay, shell, and sand but excluding the petroleum and gas, and any minerals under the premises that can be captured, mined, or recovered by means of drilling and pumping operations wherein a hole or well is drilled, sunk, or employed that will not cause a disturbance of the surface strata or the removal of overburden to a material extent beyond the immediate area of such shaft, hole, or well, and including any and all other rights, privileges, or easements mentioned, specified, set forth, created or conveyed in that certain conveyance of mineral rights dated the 15th day of February, 1955, and recorded in deed book 363 at page 207, public records of Lake County, Florida. The said Theodore Strawn, Inc. is ordered to convey or cause said rights to be conveyed by good and sufficient deed or deeds unto the plaintiff, Seminole Woods, Inc. within twenty days from the date hereof. Robert R. Strawn is hereby ordered to execute a good and sufficient deed to such of the above described surface mineral rights as were conveyed to him in the deed of February 15, 1955, within five days from the date hereof. In the event the defendant Robert R. Strawn fails or refuses to

execute such deed, then this decree shall become and operate as such deed conveying title to the said surface mineral rights unto Seminole Woods, Inc.

The agreement of August 1, 1967 is reformed by deleting from exhibit A thereto the words "owned by the corporation" where the same appear in the phrase —

> "together with all surface mineral rights owned by the corporation heretofore conveyed or released by the Wilson Cypress Company."

The deed dated August 31, 1967 is hereby reformed by deleting from said deed the words "owned by the corporation" where the same appear in the phrase —

> "together with all surface mineral rights owned by the corporation heretofore conveyed or released by the Wilson Cypress Company."

Plaintiff, Seminole Woods, Inc., is the true and equitable owner and holder of title to the oil and gas mineral rights to the above described real property covered by and described in the deed dated July 30, 1965, and recorded in official records book 292 at page 902 of the public records of Lake County, Florida, and the defendants, Robert R. Strawn, Marian W. Strawn and John R. Strawn as joint tenants with right of survivorship hold bare legal title to said rights as trustees for the use and benefit of the said plaintiff, Seminole Woods, Inc., and the said plaintiff, Seminole Woods, Inc., do have and recover from the said defendants all of the aforesaid oil and gas mineral rights pertaining to the above described real property situate in Lake County, Florida, and the said defendants shall and are hereby ordered to execute and deliver a good and sufficient deed conveying all of their interest in and to the said oil and gas mineral rights, and the said conveyance shall be in all respects, except for names of parties, the exact and verbatim counterpart of the aforesaid deed of July 30, 1965. In the event the defendants Robert R. Strawn, Marian W. Strawn, and John R. Strawn fail and refuse to execute such deed, then this decree shall become and operate as such deed conveying title to the said property unto plaintiff, Seminole Woods, Inc.

The matters urged in Count IV and the prayer for damages in Counts I and II are not ruled on at this time. The court retains jurisdiction of this cause for the purpose of making such further orders and judgments pertaining to those counts and matters as may be necessary in light of the extent to which this judgment is duly performed by the defendants.